# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM BARRIER ROBERTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18-83442-CRJ11 |
| v. | ) | |
| | ) | |
| MELANIE HAMMER MURRAY | ) | AP No. 19-80017-CRJ |
| and RHETT MURRAY, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF MELANIE HAMMER MURRAY

1.　　My name is Melanie Hammer Murray. I am of sound mind and I understand the taking of an oath. I am over nineteen (19) years of age. All of the statements made in this Affidavit are based upon my own present, personal knowledge.

2.　　I am a member of Bullet & Barrel, LLC ("B&B"), an Alabama limited liability company. I serve as B&B's President and the sole member of its Management Committee.

3.　　A true and correct copy of the Limited Liability Company Agreement of B&B, dated August 5, 2016 (the "B&B Agreement"), is attached hereto as **Exhibit 1**.

4.　　I am the custodian of the B&B Agreement attached to this Affidavit. The B&B Agreement was created at or near the time of the formation of B&B as a regular part of the business formation process, and was kept in the ordinary course of B&B's regularly conducted business activities.

FURTHER AFFIANT SAYETH NOT.



Melanie Hammer Murray

STATE OF ALABAMA        )
                        )
COUNTY OF MADISON       )


I, the undersigned authority, a Notary Public in and for said County and State, hereby certify that Melanie Hammer Murray, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, she certifies that said contents are true and correct and that this instrument was executed voluntarily on the day the same bears date.

Sworn to and subscribed before me this the 19th day of April , 2019.



_____
Notary Public

[NOTARIAL SEAL]

My Commission Expires: 7/19/21

2

# EXHIBIT 1

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## BULLET & BARREL, LLC

## AN ALABAMA LIMITED LIABILITY COMPANY

**August 5, 2016**

{H0320012.10}

# TABLE OF CONTENTS

SECTION 1 THE COMPANY .................................................................................................... 1

| | | |
|---|---|---|
| 1.1 | Formation. | 1 |
| 1.2 | Definitions. | 1 |
| 1.3 | Transactions with Affiliates. | 1 |
| 1.4 | WOSB Qualification. | 1 |

SECTION 2 MEMBERS' CAPITAL CONTRIBUTIONS; UNITS .......................................... 2

| | | |
|---|---|---|
| 2.1 | Initial Capital Contributions. | 2 |
| 2.2 | Additional Capital Contributions. | 2 |
| 2.3 | Capital Accounts. | 3 |
| 2.4 | Authorized Units. | 3 |

SECTION 3 ALLOCATIONS .................................................................................................. 4

SECTION 4 DISTRIBUTIONS ............................................................................................... 4

| | | |
|---|---|---|
| 4.1 | Net Cash Flow. | 4 |
| 4.2 | Tax Distributions. | 4 |
| 4.3 | Limitations on Distributions. | 4 |

SECTION 5 MANAGEMENT .................................................................................................. 5

| | | |
|---|---|---|
| 5.1 | Management Committee. | 5 |
| 5.2 | Meetings of the Management Committee. | 7 |
| 5.3 | Management Committee Powers. | 8 |

SECTION 6 ROLE OF MEMBERS ......................................................................................... 9

| | | |
|---|---|---|
| 6.1 | Rights or Powers. | 9 |
| 6.2 | Voting Rights. | 9 |
| 6.3 | Meetings of the Members. | 10 |
| 6.4 | Withdrawal and Dissociation. | 10 |
| 6.5 | Unitholders' Liability. | 11 |
| 6.6 | Partition. | 11 |

Case 19-80017-CRJ    Doc 9-1    Filed 04/19/19    Entered 04/19/19 16:13:41    Desc
Exhibit A    Page 6 of 47

SECTION 7 REPRESENTATIONS AND WARRANTIES..........................................................11

7.1       In General.................................................................................................................11
7.2       Representations and Warranties. ..............................................................................11

SECTION 8 BOOKS AND RECORDS; ACCOUNTING ..........................................................12

8.1       Books and Records; Accounting. .............................................................................12
8.2       Tax Matters..............................................................................................................13

SECTION 9 AMENDMENTS .................................................................................................13

9.1       Amendments.............................................................................................................13

SECTION 10 TRANSFERS AND ADMISSIONS.....................................................................14

10.1     Restrictions on Transfers.........................................................................................14
10.2     Permitted Transfers. ................................................................................................14
10.3     Conditions to Permitted Transfers............................................................................14
10.4     Right of First Refusal. .............................................................................................15
10.5     Prohibited Transfers. ...............................................................................................16
10.6     Rights of Unadmitted Assignees. .............................................................................17
10.7     Admission of Substituted Members. .........................................................................17
10.8     Cessation of Membership.........................................................................................18
10.9     Distributions and Allocations in Respect of Transferred Units. ................................18
10.10   Admission of Members After the Effective Date; Issuance of Additional
         Units. .......................................................................................................................19

SECTION 11 DISSOLUTION AND WINDING UP ...................................................................19

11.1     Dissolution Events...................................................................................................19
11.2     Winding Up. ............................................................................................................19
11.3     Compliance With Certain Requirements of Regulations; Deficit Capital
         Accounts..................................................................................................................20
11.4     Rights of Unitholders. .............................................................................................21
11.5     Notice of Dissolution/Termination...........................................................................21
11.6     Allocations During Period of Liquidation.................................................................21
11.7     The Liquidator.........................................................................................................22

SECTION 12 INDEMNIFICATION..........................................................................................22

12.1     General. ...................................................................................................................22
12.2     Separation of Claims. ..............................................................................................23
12.3     Authorization...........................................................................................................23
12.4     Advances. ................................................................................................................23

ii

| | | |
|---|---|---|
| 12.5 | Non-exclusive. | 24 |
| 12.6 | Insurance. | 24 |

SECTION 13 MISCELLANEOUS ......... 24

| | | |
|---|---|---|
| 13.1 | Notices. | 24 |
| 13.2 | Binding Effect. | 24 |
| 13.3 | Headings. | 24 |
| 13.4 | Severability. | 25 |
| 13.5 | Incorporation by Reference. | 25 |
| 13.6 | Further Actions. | 25 |
| 13.7 | Variation of Terms. | 25 |
| 13.8 | Governing Law. | 25 |
| 13.9 | Counterparts. | 25 |
| 13.10 | Prior Agreements. | 25 |
| 13.11 | Specific Performance. | 25 |

EXHIBIT A   Member Information
EXHIBIT B   Definitions
EXHIBIT C   Capital Accounts and Tax Allocations
EXHIBIT D   Officers

iii

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## BULLET & BARREL, LLC

**THIS LIMITED LIABILITY COMPANY AGREEMENT** (this "Agreement") is entered into and shall be effective as of **August 5, 2016** (the "Effective Date"), by and among the Member or Members identified on Exhibit A attached to this Agreement and who have executed this Agreement as Members.

## SECTION 1
## THE COMPANY

**1.1** **Formation.** The Member or Members hereby agree to form **BULLET & BARREL, LLC** (the "Company") as a limited liability company under and pursuant to the provisions of the LLC Law and upon the terms and conditions set forth in this Agreement. In the event there is only one Member of the Company, references herein to Members shall be deemed to refer to such single Member.

**1.2** **Definitions.** Set forth on Exhibit B are the definitions of certain capitalized terms used in this Agreement, as well as cross-references to the applicable portion of this Agreement where certain other capitalized terms are defined.

**1.3** **Transactions with Affiliates.** To the extent permitted by applicable law and subject to the provisions of this Agreement, the Management Committee is hereby authorized to cause the Company to purchase property from, sell property to or otherwise deal with any Unitholder, acting on its own behalf, or any Affiliate of any Unitholder; provided, however, that any such purchase, sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase or other transaction had been with an independent third party.

**1.4** **WOSB Qualification.** The Unitholders desire that the Company qualify as a Woman-Owned Small Business ("WOSB") within the meaning of Title 13, Part 127 of the Code of Federal Regulations and, as such, the Unitholders acknowledge that one or more women (the "Women Unitholders") must directly and unconditionally own and control at least fifty-one percent (51%) of each class or series of Units at all times during which the Company intends to remain qualified as a WOSB, as determined by the Management Committee (the "WOSB Term").

1

## SECTION 2
## MEMBERS' CAPITAL CONTRIBUTIONS; UNITS

**2.1    Initial Capital Contributions.** The name, address, telephone number, email address (if known), initial Capital Contribution (in the case of contributions of property, based upon the Gross Asset Value of such property as defined in Exhibit C), numbers and classes of Units, and initial Percentage Interest of each of the Members are as set forth on Exhibit A. The Management Committee shall update Exhibit A from time to time as necessary to accurately reflect the information therein and to reflect the admission of additional or substituted Members in accordance with this Agreement; provided, however, that the failure of the Management Committee to cause Exhibit A to be updated or otherwise amended shall not prevent the effectiveness of, or otherwise affect the underlying adjustments that would be reflected in, such update or amendment. Any amendment or revision to Exhibit A made in accordance with this Agreement shall not be deemed an amendment to this Agreement for purposes of Section 9. Any reference in this Agreement to Exhibit A shall be deemed to be a reference to Exhibit A as may be in effect from time to time.

**2.2    Additional Capital Contributions.**

(a)    Permitted Capital Contributions. Unitholders may make additional Capital Contributions only with the written consent or vote of the Management Committee, in which event the Company shall issue to any contributing Unitholder additional Units in an amount to be determined by the Management Committee.

(b)    Capital Call Rights. Each Unitholder agrees to make additional Capital Contributions in proportion to such Unitholder's Percentage Interest from time to time as the Management Committee deems appropriate. If the Management Committee determines that there is a need for additional Capital Contributions, the Management Committee shall provide each Common Unitholder with written notice (the "Contribution Notice") of the amount of additional Capital Contributions required by the Company. If a Common Unitholder (the "Non-Contributing Unitholder") shall fail to provide the Company with its proportionate share of such additional Capital Contribution (based on the respective numbers of Common Units owned by the Common Unitholders) within ten (10) days after the Person's receipt of such Contribution Notice (the "Due Date"), then Section 2.2(c) shall apply.

(c)    Failure to Contribute Capital. If a Non-Contributing Unitholder fails to make an additional Capital Contribution required by Section 2.2(b) within the ten (10) day period set forth therein (the amount of the failed contribution shall be the "Default Amount"), the contributing Common Unitholder(s) (the "Contributing Unitholders") shall have any one or more of the following remedies as their sole and exclusive remedies at law or in equity in connection with the applicable default, which remedies shall be elected by the majority of the Members that are also Contributing Unitholders (based on Percentage Interests); provided, however, that if such Members elect the remedy set forth in Section 2.2(c)(ii), they may not elect the remedies set forth in Section 2.2(c)(i) in connection with the applicable default:

(i)    to advance to the Company on behalf of, and as a loan to the Non-Contributing Unitholder, an amount equal to the Default Amount to be evidenced by a

2

promissory note in form satisfactory to the Contributing Unitholder(s), payable on demand and bearing interest at the rate of eight percent (8.0%) per annum (each such loan, a "Default Loan"). The Capital Account of the Non-Contributing Unitholder shall be credited with the amount of such Capital Contribution and such amount shall constitute a debt owed by the Non-Contributing Unitholder to the Contributing Unitholder(s). Any Default Loan shall be payable from any distributions due the Non-Contributing Unitholder hereunder (including, without limitation, distributions of Net Cash Flow), but shall in all events be payable in full by the last day of the sixth (6th) full month after the making of such Default Loan. Interest on a Default Loan to the extent unpaid shall accrue and compound monthly. A Default Loan shall be pre-payable at any time or from time to time without penalty. Such Default Loans shall be secured by the Non-Contributing Unitholder's Units in the Company, including, without limitation, such Non-Contributing Unitholder's rights to distributions under Section 4 and Section 11.2. The Non-Contributing Unitholder hereby grants a security interest in its Units to the Contributing Unitholder(s) and the Non-Contributing Unitholder hereby irrevocably appoints the Contributing Unitholder(s) as its attorney-in-fact coupled with an interest with full power to prepare and execute any documents, instruments and agreements, including, without limitation, such Uniform Commercial Code financing statements, continuation statements, and other security instruments as may be appropriate to perfect and continue the security interest in favor of the Contributing Unitholder(s). All distributions to the Non-Contributing Unitholder hereunder shall be applied first to payment of any interest due under any Default Loan and then to principal until all amounts due thereunder are paid in full; or

(ii)     to revoke the Contribution Notice for all of the Unitholders, whereupon any Capital Contributions paid by the Contributing Unitholder(s) pursuant to such Contribution Notice shall be returned, in which event the Persons requesting the additional Capital Contributions shall reconsider the needs of the Company for additional capital and may issue any Contribution Notice following such reconsideration.

The Members hereby acknowledge to one another and agree that because of the difficulty in calculating the damage that may result from the failure of a Person to make a Capital Contribution required under Section 2.2(b), the remedies set forth in this Section 2.2(c) are fair and reasonable under the circumstances, and are not, and are not to be construed as, a penalty or punitive in any manner or respect.

Notwithstanding the provisions set forth in this Section 2.2(c), no Woman Unitholder shall be required, under any circumstances, to pledge, sell or assign more than the number of Units that would result in the Women Unitholders collectively owning less than fifty-one percent (51%) of the total number of each class or series of Units of the Company, at any time during the WOSB Term.

**2.3     Capital Accounts.** The Company shall maintain a separate Capital Account for each Unitholder in accordance with Exhibit C attached hereto.

**2.4     Authorized Units.** The equity of the Company shall be represented by Units. The number of Units authorized for issuance by the Company is 1,000,000 Common Units.

3

## SECTION 3
## ALLOCATIONS

Profits and Losses shall be allocated to the Unitholders as provided in Exhibit C attached to this Agreement.

## SECTION 4
## DISTRIBUTIONS

**4.1     Net Cash Flow.**  Except as otherwise provided in Section 4.3 and Section 11, Net Cash Flow, if any, upon the approval of the Management Committee, shall be distributed to and among all of the Unitholders as follows and in the following order of priority:

(a)     First, to the Common Unitholders, in proportion to the Unrecovered Capital Contribution owing to such Member, until each Member has received cumulative cash distributions pursuant to this subparagraph (a) in an amount equal to such Common Unitholder's Unrecovered Capital Contribution; and

(b)     Finally, any remaining amounts to the Unitholders pro rata in proportion to their aggregate holdings of Units.

**4.2     Tax Distributions.**  The Company is under no obligation to make distributions to Unitholders for the purpose of allowing them to satisfy their income tax liabilities. In the event the Management Committee determines to make a distribution to Unitholders for the purpose of allowing them to satisfy their income tax liabilities, the Management Committee will use reasonable efforts to make such distribution on or before April 1 of such year in an amount equal to the product of (i) the Company's taxable income for the preceding taxable year and (ii) the sum of (A) the highest federal marginal income tax rate and (B) the highest marginal income tax rate of any state to which any Unitholder is subject, or in an amount so determined in the sole discretion of the Management Committee. All such recipients of distributions covenant that they shall pay over such portion of their distribution as is necessary to satisfy their federal and state tax liability attributable to the income of the Company.

**4.3     Limitations on Distributions.**

(a)     Special Distributions.     The Company shall make no distributions to the Unitholders except (i) as provided in this Section 4 and Section 11 or (ii) as agreed to by the Management Committee.

(b)     Solvency Requirement.  A Unitholder may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liability to Unitholders on account of their Capital Contributions, would exceed the fair value of the Company's assets.  A Unitholder who receives a distribution in violation of this Section 4.3(b), and who knew at the time of such distribution that the distribution violated this Section 4.3(b), shall be required to return or repay such distribution.

4

(c)     Amounts Withheld.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation by the Company to the Unitholders shall be treated as amounts paid or distributed, as the case may be, to the Unitholders for all purposes under this Agreement.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Unitholders, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Unitholders with respect to which such amount was withheld.

## SECTION 5
## MANAGEMENT

**5.1     Management Committee.**

(a)     General Oversight.  The activities and affairs of the Company shall be under the direction, and subject to the oversight of, a committee (the "Management Committee") as provided in Section 5.1(c).  Except as otherwise provided in this Agreement or as determined by the Management Committee, no member of the Management Committee shall have the power to act on behalf of, or to bind, the Company; provided, however, that in the event there is only one (1) member of the Management Committee, the Management Committee member shall have the power to act on behalf of the Company and bind the Company.

(b)     Number.  The number of members on the Management Committee shall be one (1) unless and until otherwise determined by the Members who own a majority of the Common Units owned by all of the Members.

(c)     Committee Member(s).  The initial member of the Management Committee shall be Melanie Murray.

(d)     Removal.  A member of the Management Committee may be removed at any time, with or without cause, by the written notice of the Members who own a majority of the Common Units owned by all of the Members delivered to the Company, demanding such removal.

(e)     Replacement.  In the event any member of the Management Committee dies or is unwilling or unable to serve as such or is removed from office in accordance with Section 5.1(d), the Members who own a majority of the Common Units owned by all of the Members shall promptly designate a successor.

(f)     Voting.  Each member of the Management Committee shall have one (1) vote. Except as otherwise provided in this Agreement, the Management Committee shall act by the affirmative vote of a majority of the total number of members of the Management Committee.

(g)     Duties.  Each member of the Management Committee shall perform such member's duties as a member of the Management Committee in good faith, in a manner such member reasonably believes to be in the best interests of the Company, and with such care as an

5

ordinarily prudent Person in a like position would use under similar circumstances. Notwithstanding the foregoing, if a member of the Management Committee is designated by a Member as provided in Section 5.1(c), such member of the Management Committee may give consideration and priority to the interests of such designating Member and such action shall not be deemed a breach of any duty owed by such member of the Management Committee to the Company or the other Members. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any member of the Management Committee. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by any applicable Alabama law, and in doing so, acknowledges and agrees that the duties and obligation of each member of the Management Committee to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a member of the Management Committee otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such member of the Management Committee.

(h)     Delegation.    The Management Committee shall have the power to delegate authority to such committees of the Management Committee, officers, employees, agents and representatives of the Company as it may from time to time deem appropriate. Any delegation of authority to take any action must be approved in the same manner as would be required for the Management Committee to approve such action directly.

(i)     Good Faith Reliance.   In performing their duties, members of the Management Committee may rely on the provisions of this Agreement. A member of the Management Committee shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Profits or Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another member of the Management Committee; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the LLC Law.

(j)     Officers.   The Management Committee shall appoint such officers as it may from time to time deem appropriate and may assign titles to particular officers.   Unless the Management Committee otherwise decides, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation or limitation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation or limitation of authority and duties made by the Management Committee. The management of the business and affairs of the Company by the officers and the exercising of their powers shall be conducted under the supervision of and subject to the approval of the Management Committee. Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or until such officer shall resign or shall have been removed. Any number of offices may be held by the same individual.     The initial officers of the Company, if any, are set forth on Exhibit D.

6

The Management Committee may revise Exhibit D upon any change in the officers of the Company.

(k) No Liability for Company's Obligations. A member of the Management Committee shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

## 5.2 Meetings of the Management Committee.

(a) Regular Meetings. The Management Committee shall hold regular meetings at such times as are determined by the Management Committee and may establish meeting times, dates and places and requisite notice requirements (not shorter than those provided in Section 5.2(b)) and adopt rules or procedures consistent with the terms of this Agreement. At such meetings the Management Committee shall transact such business as may properly be brought before the meeting, whether or not notice of such meeting referenced the action taken at such meeting.

(b) Special Meetings. Special meetings of the Management Committee may be called by any member of the Management Committee. Notice of each such meeting shall be given to each member of the Management Committee by hand, telephone, electronic mail, facsimile, overnight courier or similar method (in each case, notice shall be given at least seventy-two (72) hours before the time of the meeting) or sent by first-class mail (in which case notice shall be given at least five (5) calendar days before the meeting), unless a longer notice period is established by the Management Committee. Each such notice shall state (i) the time, date, place (which shall be at the principal office of the Company unless otherwise agreed to by all of the members of the Management Committee) or other means of conducting such meeting and (ii) the purpose of the meeting to be so held. No actions other than those specified in the notice may be considered at any special meeting unless unanimously approved by the members of the Management Committee. Any member of the Management Committee may waive notice of any meeting in writing before, at, or after such meeting. The attendance of a member of the Management Committee at a meeting shall constitute a waiver of notice of such meeting, except when a member of the Management Committee attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not properly called.

(c) Participation in Meeting by Conference Telephone. Any action required to be taken at a meeting of the Management Committee, or any action that may be taken at a meeting of the Management Committee, may be taken at a meeting held by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting.

(d) Action by Written Consent. Notwithstanding anything to the contrary in this Section 5.2, the Management Committee may take without a meeting any action that may be taken by the Management Committee under this Agreement if such action is approved by the written consent of the members of the Management Committee having not less than the minimum number of votes necessary to authorize or take such action at a meeting at which all Management Committee members entitled to vote thereon were present; provided, however, that

7

if action is taken hereunder by less than all of the members of the Management Committee, notice of such action shall be provided to the nonparticipating members of the Management Committee. Failure to provide the notice described in the preceding sentence shall not invalidate or otherwise affect the validity of any action properly taken by the members of the Management Committee.

(e) <u>Proxy</u>. A member of the Management Committee may vote or be present at a meeting of the Management Committee either in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or on other such terms as the Management Committee shall deem appropriate.

### 5.3 <u>Management Committee Powers</u>.

(a) <u>General Powers</u>. Except as otherwise provided in this Agreement including without limitation <u>Section 5.3(b)</u>, all powers to control and manage the business and affairs of the Company shall be exclusively vested in the Management Committee, and the Management Committee may exercise all powers of the Company and do all such lawful acts as are not by statute or this Agreement directed or required to be exercised or done by the Members and in so doing shall have the right and authority to take all actions which the Management Committee deems necessary, useful or appropriate for the management and conduct of the business of the Company.

(b) <u>Restrictions</u>. Notwithstanding the provisions of <u>Section 5.3(a)</u> or any other provision of this Agreement, the Management Committee shall not have authority to, and covenants and agrees that it shall not, do any of the following acts on behalf of the Company without the written consent or vote of the Members who own at least a majority of the Common Units owned by all Members:

(i) knowingly do any act in contradiction of this Agreement;

(ii) knowingly do any act which would make it impossible to carry out the ordinary business of the Company, except as otherwise provided in this Agreement;

(iii) engage in any transaction between the Company and any Unitholder or Affiliate thereof of which the Management Committee has determined is not on an arm's length basis;

(iv) possess Company property or assign rights in specific Company property other than for a Company purpose;

(v) sell or otherwise dispose of all or substantially all of the property of the Company except for liquidating sales of the Company assets in connection with the dissolution of the Company;

(vi) knowingly cause or permit the Company to engage in any activity which would constitute a material change in the nature of the Company's business; or

(vii) adopt an agreement of merger, conversion or consolidation;

8

(viii) borrow money or issue evidences of indebtedness or secure the same by mortgage, pledge, or other lien on any Company assets, excluding the debt to be incurred in connection with the Project Financing, which is hereby approved by each Member executing this Agreement;

(ix) prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company or execute any extensions or renewals of encumbrances on any or all of such assets, including, without limitation, the prepayment, refinancing, recasting, increasing, modifying or extending the Project Financing;

(x) create any obligation or enter into any contract on behalf of the Company valued at greater than $5,000.00;

(xi) acquire by purchase, lease, or otherwise any real property;

(xii) execute any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets;

(xiii) institute, prosecute, defend, settle, compromise, or dismiss lawsuits or other judicial or administrative proceedings brought on or on behalf of, or against, the Company, the Members or any member of the Management Committee in connection with activities arising out of, connected with, or incidental to this Agreement, or to engage counsel or others in connection therewith; or

(xiv) purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, or otherwise use or deal in or with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them.

## SECTION 6
## ROLE OF MEMBERS

**6.1** **Rights or Powers.** No Member, in his, her or its capacity as a Member, shall have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way. Notwithstanding the foregoing, the Members have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the LLC Law.

**6.2** **Voting Rights.** No Member has any voting right except with respect to those matters specifically reserved for a Member vote or consent which are set forth in this Agreement or as required in the LLC Law. Each Member shall be entitled to one (1) vote per Unit owned on all matters submitted to the Members for a vote or consent. Except as otherwise provided in this Agreement, the Members shall act by the affirmative vote of a Majority in Interest of the Members. A Person who is not an initial Member or admitted as an additional or substituted Member has no rights to vote on matters specifically reserved for a vote of the Members.

9

## 6.3 Meetings of the Members.

(a) Notice; Voting; Quorum. Meetings of the Members may be called upon the written notice of Members who own ten percent (10%) or more of the Units owned by all of the Members. The notice shall state the location of the meeting and the nature of the business to be transacted and shall be given to all of the Members not less than seven (7) days nor more than thirty (30) days prior to the date of such meeting. Members may vote in person, by proxy, by telephone, or by Electronic Transmission at such meeting and may waive advance notice of such meeting. A quorum at any meeting shall mean Members present in person or by proxy that would constitute a sufficient number of Members to affirmatively approve any matter which requires a vote or consent greater than a Majority in Interest of the Members, or if the matter requires a Majority in Interest of the Members, then a quorum shall consist of a Majority in Interest of the Members. Whenever the vote or consent of Members is permitted or required under the Agreement, such vote or consent may be given at a meeting of the Members or may be given in accordance with the procedure prescribed in this Section 6.3.

(b) Record Date. For the purpose of determining the Members entitled to vote on, or to vote at, any meeting of the Members or any adjournment thereof, the Management Committee may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty (30) days nor less than ten (10) days before any such meeting.

(c) Presiding Officer. Each meeting of Members shall be conducted by the chief officer of the Company or such other individual Person as a Majority in Interest of the Members deems appropriate.

(d) Action by Written Consent. Notwithstanding this Section 6.3, the Company may take any action contemplated under this Agreement as approved by the written consent of the Members owning not less than the percentage of Units necessary to authorize or take such action at a meeting at which all of the Members entitled to vote thereon were present; provided, however, that if action is taken hereunder by less than all of the Members, notice of such action shall be provided to the nonparticipating Members. Failure to provide the notice described in the preceding sentence shall not invalidate or otherwise affect the validity of any action properly taken by the Members holding the requisite percentage of Units.

## 6.4 Withdrawal and Dissociation.

(a) Withdrawal. Except as otherwise provided in Section 4 and Section 11, no Unitholder shall demand or receive a return on or of its Capital Contributions or withdraw in any manner such Unitholder's Transferable Interest in the Company without the consent of the Management Committee.

(b) Dissociation. No Member has the right to voluntarily dissociate as a Member. If a Person dissociates as a Member, such Person shall retain such Person's Transferable Interest but shall have no right to participate in the direction and oversight of the activities and affairs of the Company. In the event a Person dissociates as a Member, neither the Company nor any of its other Members shall have any obligation to purchase all or any portion of such former Member's interest in the Company. A Person that wrongfully dissociates, or wrongfully attempts to

10

dissociate, as a Member is liable to the Company and, subject to the LLC Law, to the other Members for damages caused by the dissociation. The liability is in addition to any other debt, obligation, or liability of the Member to the Company or the other Members.

**6.5     Unitholders' Liability.** No Unitholder shall be liable under a judgment, decree or order of a court, or in any other manner for the debts or any other obligations or liabilities of the Company. A Unitholder shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments or payments to the Company, provided that a Unitholder may be required to repay distributions made to it as provided in Section 4.3 or the LLC Law. No Unitholder shall have any personal liability for the repayment of any Capital Contributions of any other Unitholder.

**6.6     Partition.** While the Company remains in effect or is continued, each Member agrees and waives its rights to have any Company property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Company property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

## SECTION 7
## REPRESENTATIONS AND WARRANTIES

**7.1     In General.** As of the date hereof, each Member hereby makes each of the representations and warranties applicable to such Member as set forth in Section 7.2, and such representations and warranties shall survive the execution of this Agreement.

**7.2     Representations and Warranties.** Each Member hereby represents and warrants that:

(a)     Due Incorporation or Formation: Authorization of Agreement. If the Member is a corporation, partnership, limited liability company or trust, such Member is a corporation duly organized or a partnership, limited liability company or trust duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership, limited liability company or trust power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby; such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the corporate, partnership, limited liability company or trust power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, partnership, company or trust action. This Agreement constitutes the legal, valid, and binding obligation of such Member.

(b)     No Conflict with Restrictions: No Default. Neither the execution, delivery, or performance of this Agreement nor the consummation by such Member of the transactions

11

contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of any governing document of such Member, or of any material agreement or instrument to which such Member is a party or by which such Member is, or may be, bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member is a party or by which such Member is, or may be, bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member.

(c)     Investigation.     Such Member is acquiring its Units based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis, and expertise. Such Member's acquisition of its Units is being made for its own account for investment, and not with a view to the sale or distribution thereof. Such Member is a sophisticated investor possessing the requisite knowledge enabling it to make an informed investment decision concerning the relative merits and risks associated with the acquisition of Units.

## SECTION 8
## BOOKS AND RECORDS; ACCOUNTING

**8.1     Books and Records; Accounting.**

(a)     Books and Records.     The Company shall keep on site at its principal place of business each of the following:

(i)     a current list of the full name and last known business or residence street address of each Member and each member of the Management Committee;

(ii)     a copy of the Filing Instrument and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any documents have been executed;

(iii)     copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years;

(iv)     copies of this Agreement and any amendments hereto; and

(v)     copies of any financial statements of the Company for the three (3) most recent years.

12

(b)　Access to Records. Any Member or its designated representative has the right to have reasonable access to and inspect and copy the contents of the books or records referenced in Section 8.1(a) and shall also have reasonable access during normal business hours and for a proper purpose to such additional financial information, documents, books and records as is deemed appropriate by the Management Committee in its sole discretion. The rights granted to a Member pursuant to this Section 8.1 are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

(c)　Accounting Method. The Company shall use the method of accounting determined by the Management Committee in the preparation of its financial reports and for tax purposes and shall keep its books and records accordingly.

**8.2　Tax Matters.** The Management Committee shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, or foreign tax purposes including without limitation any election, if permitted by applicable law: (a) to adjust the basis of property pursuant to Code sections 734(b), 743(b) and 754, or comparable provisions of state, local or foreign law, in connection with Transfers of Units and Company distributions; (b) to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; and (c) to the extent provided in Code sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members. Melanie Murray is specifically authorized to act as the "Tax Matters Partner" under the Code and in any similar capacity under state or local law.

## SECTION 9
## AMENDMENTS

**9.1　Amendments.**

(a)　Consent. Amendments to this Agreement may be proposed by any Member. Following such proposal, the Management Committee shall submit to the Members a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Management Committee shall include in any such submission a recommendation as to the proposed amendment. The Management Committee shall seek the written vote of the Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the written consent or vote of a Majority in Interest of the Members.

(b)　**Certain Amendments.** Notwithstanding Section 9.1(a) or any other provision herein to the contrary (other than Section 2.1), this Agreement shall not be amended without the

13

consent of each Member adversely affected if such amendment would modify the limited liability of a Member or alter the interest of a Unitholder in Profits, Losses or any Company distributions. Additionally, no amendment may alter any provision of this Agreement requiring approval by greater than a Majority in Interest of the Members without the approval of that percent of Members required to approve such action, if proposed.

## SECTION 10
## TRANSFERS AND ADMISSIONS

**10.1** **Restrictions on Transfers.** Except as otherwise permitted by this Agreement, no Unitholder shall Transfer all or any portion of its Units.

**10.2** **Permitted Transfers.** Subject to the conditions and restrictions set forth in Section 10.3, a Unitholder may at any time Transfer all or any portion of its Units to (a) any other Member, (b) any wholly owned Affiliate of any Member or a Family Member, (c) the transferor's executors, administrators, testamentary trustees, legatees or beneficiaries to whom such Units are transferred involuntarily by operation of law to whom such Units are transferred involuntarily by operation of law, (d) any Purchaser in accordance with Section 10.4, (e) the Company or a third party upon the consent of the Management Committee or (f) any Transfer made by any Woman Unitholder to any person at any time during the WOSB Term (any such Transfer being referred to this Agreement as a "Permitted Transfer").

**10.3** **Conditions to Permitted Transfers.** A Transfer shall not be treated as a Permitted Transfer under Section 10.2 unless and until the following conditions are satisfied:

(a) Documentation. Except in the case of a Transfer at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the agreement of the transferee to be bound by this Agreement. In the case of a Transfer of Units at death or involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b) Taxpayer Information. The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Units until it has received such information.

(c) Registration. Except in the case of a Transfer of any Units at death or involuntarily by operation of law, either (i) such Units shall be registered under the Securities Act of 1933, as amended, and any applicable state securities law, or (ii) the transferor shall, upon request by the Company, provide an opinion of counsel, which opinion of counsel shall be

14

reasonably satisfactory to the Management Committee, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

(d)    No Technical Termination.    Unless otherwise approved by the Management Committee, no Transfer of Units shall be made except upon terms which would not, in the opinion of counsel chosen by the Management Committee, result in the termination of the Company within the meaning of Code Section 708.

(e)    Additional Restrictions.    No notice or request initiating the procedures contemplated by Section 10.4 may be given by any Unitholder, while any notice, purchase or Transfer is pending under Section 10.4 or after a Dissolution Event has occurred. No Unitholder may sell any portion of its Units pursuant to Section 10.4 during any period that, as provided above, it may not give the notice initiating the procedures contemplated by such Section or thereafter until it has given such notice and otherwise complied with the provisions of such Section.

**10.4    Right of First Refusal.**    In addition to the other limitations and restrictions set forth in this Section 10, except as permitted by Section 10.2, no Unitholder shall Transfer all or any portion of its Units (the "Offered Units") unless such Unitholder (the "Seller") first offers to sell the Offered Units pursuant to the terms of this Section 10.4.

(a)    Limitation on Transfers.    No Transfer may be made under this Section 10.4 unless the Seller has received a bona fide written offer (the "Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Units for a purchase price (the "Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer shall be in writing signed by the Purchaser and shall be irrevocable for a period ending no sooner than the first business day following the end of the Offer Period, as hereinafter defined.

(b)    Offer Notice.    Prior to making any Transfer that is subject to the terms of this Section 10.4, the Seller shall give to the Company and each other Member written notice (the "Offer Notice") which shall include a copy of the Purchase Offer and an offer (the "Firm Offer") to sell the Offered Units to the other Members (the "Offerees") for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer, provided that the Firm Offer shall be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Units) to be provided by the Purchaser for any deferred portion of the Offer Price.

(c)    Offer Period.    The Firm Offer shall be irrevocable for a period (the "Offer Period") ending at 11:59 p.m., local time at the Company's principal place of business, on the ninetieth (90th) calendar day following the day of the Offer Notice. For so long as Rhett Murray, or any Family Member of Rhett Murray is a Member, the first thirty (30) days of the Offer Period shall be considered the "Murray Offer Period."

15

(d) <u>Acceptance of Firm Offer by Murray</u>. At any time during the Murray Offer Period, Murray, and/or any Family Member who is a Member (the "Murray Offerees") may accept the Firm Offer as to all or any portion of the Offered Units, by giving written notice of such acceptance to the Seller and each other Murray Offeree, which notice shall indicate the maximum number of Units that such Murray Offeree is willing to purchase. In the event that the Murray Offerees ("Accepting Murray Offerees"), in the aggregate, accept the Firm Offer with respect to all of the Offered Units, the Firm Offer shall be deemed to be accepted and each Accepting Murray Offeree shall be deemed to have accepted the Firm Offer as to that portion of the Offered Units that corresponds to the ratio of the number of Units that such Accepting Murray Offeree indicated a willingness to purchase to the aggregate number of Units all Accepting Murray Offerees indicated a willingness to purchase.

(e) <u>Acceptance of Firm Offer</u>. In the event the Murray Offerees do not accept all of the Firm Offer during the Murray Offer Period, any Offeree may accept the Firm Offer as to all or any portion of the Offered Units, by giving written notice of such acceptance to the Seller and each other Offeree, which notice shall indicate the maximum number of Units that such Offeree is willing to purchase. In the event that Offerees ("Accepting Offerees"), in the aggregate, accept the Firm Offer with respect to the remaining balance of the Offered Units, the Firm Offer shall be deemed to be accepted and each Accepting Offeree shall be deemed to have accepted the Firm Offer as to that portion of the Offered Units that corresponds to the ratio of the number of Units that such Accepting Offeree indicated a willingness to purchase to the aggregate number of Units all Accepting Offerees indicated a willingness to purchase. If Offerees (inclusive of the Murray Offerees) do not accept the Firm Offer as to all of the Offered Units during the Offer Period, the Firm Offer shall be deemed to be rejected in its entirety.

(f) <u>Closing of Purchase Pursuant to Firm Offer</u>. In the event that the Firm Offer is accepted, the closing of the sale of the Offered Units shall take place within thirty (30) calendar days after the Firm Offer is accepted or, if later, the date of closing set forth in the Purchase Offer. The Seller and all Accepting Offerees (including the Accepting Murray Offerees, as applicable) shall execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Units pursuant to the terms of the Firm Offer and this <u>Section 10</u>.

(g) <u>Sale Pursuant to Purchase Offer If Firm Offer Rejected</u>. If the Firm Offer is not accepted in the manner hereinabove provided, the Seller may sell the Offered Units to the Purchaser at any time within sixty (60) calendar days after the last day of the Offer Period, provided that such sale shall be made on the terms contained in the Purchase Offer and provided further that such sale complies with other terms, conditions, and restrictions of this Agreement that are not expressly made inapplicable to sales occurring under this <u>Section 10.4</u>. In the event that the Offered Units are not sold in accordance with the terms of the preceding sentence, the Offered Units shall again become subject to all of the conditions and restrictions of this <u>Section 10.4</u>.

**10.5   Prohibited Transfers.** Any purported Transfer of Units that is not a Permitted Transfer shall be null and void and of no force or effect whatsoever; provided, however, that, if the Company is required to recognize a Transfer that is not a Permitted Transfer, the Units Transferred shall be strictly limited to the transferor's Transferable Interest as provided by this Agreement with respect to the Transferred Units, which Transferable Interest may be applied

16

(without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Units may have to the Company.

In the case of a Transfer or attempted Transfer of Units that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including without limitation incremental tax liabilities, and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

**10.6    Rights of Unadmitted Assignees.**  A Person who acquires Units, but who is not admitted as a substituted Member pursuant to Section 10.7, shall only be a holder of a Transferable Interest with respect to such Units in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and except as otherwise provided in the LLC Law or this Agreement, shall not have any rights to participate in the direction and oversight of the activities and affairs of the Company or have other rights of a Member under the LLC Law or this Agreement.  A Person who is not admitted as a substituted Member shall be considered as a Member for the limited purpose of determining the Transferable Interest of such Person and all other Persons who have Transferable Interests hereunder.

**10.7    Admission of Substituted Members.**  Subject to the other provisions of this Section 10, a transferee of Units may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 10.7:

(a)    Consent of the Management Committee.  The Management Committee consents to such admission or votes for such admission, which consent or vote may be given or withheld in the sole and absolute discretion of the Management Committee;

(b)    Permitted Transfers.  The Units with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer;

(c)    Joinder.  The transferee of Units (other than, with respect to clauses (i) and (ii) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Management Committee (and, in the case of clause (iii) below, the transferor Member), (i) make representations and warranties to each nontransferring Member equivalent to those set forth in Section 7, (ii) accept and adopt the terms and provisions of this Agreement, including this Section 10, and (iii) assume the obligations of the transferor Member under this Agreement with respect to the Transferred Units.  The transferor Member shall be released from all such assumed obligations except (x) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement, (y) in the case of a Transfer to any Person other than a Member or any of its Affiliates, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer, and (z) in the case of a Transfer to any of its Affiliates, any Capital Contribution or other financing obligation of the transferor Member under this Agreement;

17

(d) Reimbursement of Company Expenses. The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Units; and

(e) Other Documentation. Except in the case of a Transfer by death or involuntarily by operation of law, if required by the Management Committee, the transferee and transferor shall each execute and deliver such other instruments as the Management Committee reasonably deems necessary or appropriate to effect the Transfer.

**10.8 Cessation of Membership.** If any Units are Transferred in compliance with the provisions of this Section 10 or as required to be recognized by the Company, the transferor shall have no further rights to participate in the direction and oversight of the activities and affairs of the Company or other rights of a Member under the LLC Law or this Agreement with respect to such Transferred Units as of the effective date of such Transfer. If the Units are Transferred to the Company in compliance with the provisions of this Section 10, such Units shall no longer be considered issued and outstanding.

**10.9 Distributions and Allocations in Respect of Transferred Units.** If any Units are Transferred during any Fiscal Year in compliance with the provisions of this Section 10, Profits, Losses, each item thereof, and all other items attributable to the Transferred Units for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Percentage Interests during the Fiscal Year in accordance with Code section 706(d), using any conventions permitted by law and selected by the Management Committee. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten (10) business days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer, and provided further that if the Company does not receive a notice stating the date such Units were Transferred and such other information as the Management Committee may reasonably require within thirty (30) calendar days after the end of the Fiscal Year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the Units on the last day of such Fiscal Year. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 10.9, whether or not any Member or the Company has knowledge of any Transfer of ownership of any Units.

18

**10.10** **Admission of Members After the Effective Date; Issuance of Additional Units.**

(a)    Admission of Additional Members. The Company, upon the consent or vote of the Management Committee, may admit additional Members and issue additional Units to such additional Members upon such terms and conditions as may be determined appropriate by the Management Committee.

(b)    Issuance of Additional Units. In addition to the adjustments permitted by Section 2.2(a), the Company, upon consent or vote of the Management Committee, may increase the number of Units owned by an existing Member upon such terms and conditions as may be determined appropriate by the Management Committee.

## SECTION 11
## DISSOLUTION AND WINDING UP

**11.1** **Dissolution Events.**

(a)    Dissolution. The Company is dissolved and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

(i)    the written consent or vote of a Majority in Interest of the Members to dissolve, wind up, and liquidate the Company;

(ii)    a judicial determination in accordance with the LLC Law that an event has occurred that makes it unlawful, impossible or impractical to carry on the business of the Company; or

(iii)    there are no remaining Members, unless within ninety (90) calendar days after the dissociation of the last Member, all of the holders of Transferable Interests agree in writing to continue the legal existence and affairs of the Company and to appoint one or more new Members.

The Members hereby agree that, notwithstanding any provision of the LLC Law, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)    Reinstatement. If the Company has dissolved pursuant to (A) Sections 11.1(a)(i) or (ii), the Company may be reinstated upon the written consent or vote of a Majority in Interest of the Members or (B) Section 11.1(a)(iii), the Company may be reinstated upon the written consent or vote of all of the holders of Transferable Interests. Upon such consent or vote, the Company shall file a Certificate of Reinstatement pursuant to the LLC Law, shall continue its legal existence until the occurrence of a Dissolution Event as provided in Section 11.1(a) and shall continue its business and existence on the same terms and conditions set forth in this Agreement.

**11.2** **Winding Up.** Upon the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 11.1(b)), the Company shall continue solely for the purposes

19

of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Company property has been distributed pursuant to this Section 11.2. Upon the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 11.1(b)), the Company may file a Statement of Dissolution pursuant to the LLC Law upon the written consent or vote of a Majority in Interest of the Members. The Liquidator (as determined pursuant to Section 11.7) shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) calendar days of the occurrence of the Dissolution Event and within ninety (90) calendar days after the last day on which the Company may be reconstituted pursuant to Section 11.1(b). The Liquidator shall take full account of the Company's liabilities and property and shall cause the property or the proceeds from the sale thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(a)     To Creditors.  First, to creditors (including Unitholders who are creditors to the extent allowed by the LLC Law or otherwise permitted by law) in satisfaction of all of the Company's debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for interim distributions to Unitholders under the LLC Law;

(b)     Interim Distributions.  Second, except as provided in this Agreement, to Unitholders and former Unitholders of the Company in satisfaction of liabilities for interim distributions under the LLC Law; and

(c)     Balance.  The balance, if any, to the Unitholders in the same manner as distributions are made under Section 4.1.

No Member shall receive additional compensation for any services performed pursuant to this Section 11. The Liquidator may determine whether to distribute all or any portion of the Company property in-kind or to sell all or any portion of such property and distribute the proceeds therefrom.

**11.3     Compliance With Certain Requirements of Regulations; Deficit Capital Accounts.**  In the event the Company is "liquidated" within the meaning of Regulations section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 11 to the Unitholders who have positive Capital Accounts in compliance with Regulations section 1.704-1(b)(2)(ii)(b)(2). If any Unitholder has a deficit balance in such Unitholder's Capital Account (after giving effect to all contributions, distributions and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Unitholder shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Unitholders pursuant to this Section 11 may be:

Case 19-80017-CRJ   Doc 9-1   Filed 04/19/19   Entered 04/19/19 16:13:41   Desc
Exhibit A   Page 28 of 47

(a)    Liquidation Trust.    Distributed to a trust established for the benefit of the Unitholders for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Unitholders from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Unitholders pursuant to Section 11.2; or

(b)    Reserves.    Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Unitholders as soon as practicable.

**11.4    Rights of Unitholders.**    Except as otherwise provided in this Agreement, each Unitholder shall look solely to the property of the Company for the return of its Capital Contribution and has no right or power to demand or receive property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Unitholders shall have no recourse against the Company or any other Unitholder, including Unitholders who are members of the Management Committee.

**11.5    Notice of Dissolution/Termination.**

(a)    Notice.    In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 11.1, result in a dissolution of the Company, the Management Committee shall, within thirty (30) calendar days thereafter, provide written notice thereof to each of the Members and to those known to have claims against the Company and shall publish notice thereof in a newspaper of general circulation in the county in which the Company's principal office was last located (as determined in the discretion of the Management Committee), which notice shall set forth such information as would be required by the LLC Law to commence the period after the expiration of which claims against the Company would be barred.

(b)    Termination.    Upon completion of the distribution of the Company's property as provided in this Section 11, the Company shall be terminated, and the Liquidator shall ensure that all filings required by the LLC Law are made and shall take all such other actions as may be necessary to terminate the Company.

**11.6    Allocations During Period of Liquidation.**    During the period commencing on the first day of the Fiscal Year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Unitholders pursuant to Section 11.2, the Unitholders shall continue to share Profits, Losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Exhibit C.

21

### 11.7 **The Liquidator.**

(a) Appointment. The "Liquidator" shall mean a Person appointed by the Management Committee to oversee the liquidation of the Company.

(b) Fee. The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Section 11 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c) Indemnification. The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

## SECTION 12
## INDEMNIFICATION

In amplification, and not in limitation, of applicable provisions of the LLC Law and other provisions of Alabama law:

### 12.1 **General.**

(a) Mandatory. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals (other than an action by or in the right of the Company), whether informal or formal by reason of the fact that such Person is or was a Member or Management Committee member against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with the defense or settlement of such claim, action, suit or proceeding if such Person acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company; and with respect to any criminal action or proceeding, had no reasonable cause to believe such Person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that such Person did not act in good faith and in a manner which such Person reasonably believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such Person's conduct was unlawful. Provided, however, that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable for negligence or misconduct in the performance of such Person's duty to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon

22

application that, despite the adjudication of liability but in view of all circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(b)     Permissive. The Company may indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals (other than an action by or in the right of the Company), whether informal or formal by reason of the fact that such Person is or was an officer, employee or agent of the Company or its Affiliate, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with the defense or settlement of such claim, action, suit or proceeding if such Person acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company; and with respect to any criminal action or proceeding, had no reasonable cause to believe such Person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that such Person did not act in good faith and in a manner which such Person reasonably believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such Person's conduct was unlawful.   Provided, however, that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable for negligence or misconduct in the performance of such Person's duty to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

**12.2     Separation of Claims.** To the extent that a Member or Management Committee member (or officer of the Company or an Affiliate of any of the foregoing, if applicable) has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 12.1, or in defense of any claim, issue or matter therein, such Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection therewith, notwithstanding that such Person has not been successful on any other claim, issue or matter in any such action, suit or proceeding.

**12.3     Authorization.** Any indemnification under Section 12.1 (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Member or Management Committee member (or officer of the Company, or an Affiliate of any of the foregoing, if applicable) is proper in the circumstances because such Person has met the applicable standard of conduct set forth in Section 12.1. Such determination shall be made by the Management Committee.

**12.4     Advances.** Expenses (including attorneys' fees) incurred in defending a civil or criminal claim, action, suit or proceeding may be paid by the Company in advance of the final disposition of such claim, action, suit or proceeding as authorized in the manner provided in this Section 12.4 upon receipt of an undertaking by or on behalf of the Member, Management Committee member or officer of the Company, or an Affiliate of any of the foregoing, to repay

23

such amount if, and to the extent that, it shall ultimately be determined that such Person is not entitled to be indemnified by the Company as authorized in this Section 12.

**12.5** **Non-exclusive.** The indemnification authorized by this Section 12 shall not be deemed exclusive of, and shall be in addition to, any other rights to which those indemnified may be entitled under any statute, rule of law, this Agreement, other agreement, vote of Members or otherwise, both as to action in such Person's official capacity and as to action in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Member, Management Committee member or officer of the Company, or any Affiliate of any of the foregoing, and shall inure to the benefit of the heirs, executors, administrators and assigns of such a Person.

**12.6** **Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Member, Management Committee member, officer, employee or agent of the Company or any Affiliate of any of the foregoing, or is or was serving at the request of the Company or the Management Committee as a director, officer, partner, manager, employee, trustee or agent of another company, partnership, joint venture, trust or other enterprise against any liability asserted against, and incurred by, such Person in any such capacity or arising out of such Person's status as such, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Section 12.

## SECTION 13
## MISCELLANEOUS

**13.1** **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (i) when delivered personally to the Person or to any officer of the Person to whom the same is directed, (ii) on the date sent by email of a PDF document, with confirmation of transmission, if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient or (iii) when actually received by the addressee if sent either by registered or certified mail or nationally recognized overnight courier, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Company and the Unitholders:

(a)     To Company. If to the Company, to the address of its principal place of business or its registered office address;

(b)     To Unitholders. If to a Unitholder, to the address set forth in Exhibit A to this Agreement.

**13.2** **Binding Effect.** Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Unitholders and their respective successors, transferees, and assigns.

**13.3** **Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

24

**13.4** **Severability.** Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement. The preceding sentence of this Section 13.4 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

**13.5** **Incorporation by Reference.** Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

**13.6** **Further Actions.** Each Unitholder upon the request of the Management Committee agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**13.7** **Variation of Terms.** All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

**13.8** **Governing Law.** The laws of the State of Alabama shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.

**13.9** **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same document. A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**13.10** **Prior Agreements.** This Agreement supersedes all prior understandings or agreements, written or oral, between the parties relating to the subject matter hereof.

**13.11** **Specific Performance.** Each Unitholder agrees with the other Unitholders that the other Unitholders would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Unitholders may be entitled, at law or in equity, the nonbreaching Unitholders shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

(signature page follows)

25

**IN WITNESS WHEREOF**, the parties hereto have executed or caused the execution of this Agreement as of the Effective Date.

_____
Melanie Murray

_____
William Roberts

## EXHIBIT A

| Member Name/Address<br>Telephone & Email | Initial Capital<br>Contribution | Units | Percentage<br>Interest |
|---|---|---|---|
| Melanie Murray<br>612 Eustis Avenue<br>Huntsville, AL 35801<br>Telephone: (256) 679-0638<br>Email: _____ | $510,000.00 | 510,000 | 51% |
| William Roberts<br>2115 Big Cove Road<br>Huntsville, AL 35801<br>Telephone: (256) 990-7735<br>Email: _____ | $490,000.00 | 490,000 | 49% |

A-1

## EXHIBIT B

### Definitions

Except as otherwise set forth in Exhibit C, capitalized words and phrases used in this Agreement have the following meanings:

"**Accepting Offerees**" has the meaning set forth in Section 10.4(e).

"**Affiliate**" means, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interest of such Person, or (iii) any officer, director, general partner, member, shareholder or trustee of such Person. For purposes of this definition, the terms "controls," "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Capital Account**" means, with respect to any Unitholder, the Capital Contributions made by such Unitholder as adjusted up to the date in question pursuant to Section 2.

"**Capital Contributions**" means, with respect to any Unitholder, the amount of money and the Gross Asset Value at the time of contribution of any property (other than money) contributed to the Company with respect to the Units in the Company held or purchased by such Unitholder, including any additional Capital Contributions.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in Section 1.1.

"**Common Unit**" means a Unit having the rights and obligations specified with respect to Common Units in this Agreement.

"**Common Unitholder**" means any Unitholder owning one or more Common Units.

"**Contributing Unitholder**" has the meaning set forth in Section 2.2(c).

"**Contribution Notice**" has the meaning set forth in Section 2.2(b).

"**Default Amount**" has the meaning set forth in Section 2.2(c).

"**Default Loan**" has the meaning set forth in Section 2.2(c)(i).

"**Due Date**" has the meaning set forth in Section 2.2(b).

{H0320012.10}                                        B-1

"**Dissolution Event**" has the meaning set forth in Section 11.1(a).

"**Effective Date**" has the meaning set forth in the introductory paragraph.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Family Member**" means, with respect to any Member who is an individual, any current spouse, child, grandchild, sibling or parent of such Member.

"**Filing Instrument**" means the Certificate of Formation filed with the Filing Office pursuant to the LLC Law to form the Company, as amended or restated.

"**Filing Office**" means the office of the Judge of Probate for Madison County, Alabama.

"**Firm Offer**" has the meaning set forth in Section 10.4(b).

"**Fiscal Year**" means (i) the period commencing on the Effective Date and ending on December 31 of such year, (ii) any subsequent twelve-month period commencing on January 1 and ending on December 31 and (iii) the period commencing on the immediately preceding January 1 and ending on the date on which all property is distributed to the Unitholders pursuant to Section 11.

"**Liquidator**" has the meaning set forth in Section 11.7.

"**LLC Law**" means the Alabama Limited Liability Company Law of 2014, as amended from time to time.

"**Losses**" has the meaning set forth in the definition of "Profits" and "Losses."

"**Majority in Interest of the Members**" means Members who own more than fifty percent (50%) of the Units held by all of the Members.

"**Management Committee**" has the meaning set forth in Section 5.1(a).

"**Member**" means any Person (i) who is referred to as such on Exhibit A to this Agreement, or who has become an additional or substituted Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member.

"**Net Cash Flow**" means the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Management Committee. Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

Case 19-80017-CRJ   Doc 9-1   Filed 04/19/19   Entered 04/19/19 16:13:41   Desc
Exhibit A   Page 37 of 47

"**Non-Contributing Unitholder**" has the meaning set forth in Section 2.2(b).

"**Notice**" has the meaning set forth in Section 2.5.

"**Offer Notice**" has the meaning set forth in Section 10.4(b).

"**Offer Price**" has the meaning set forth in Section 10.4(a).

"**Offer Period**" has the meaning set forth in Section 10.4(c).

"**Offerees**" has the meaning set forth in Section 10.4(b).

"**Offered Units**" has the meaning set forth in Section 10.4.

"**Percentage Interest**" means, with respect to any Unitholder as of any date, the ratio (expressed as a percentage) of the number of Units held by such Unitholder on such date to the aggregate Units held by all of the Unitholders on such date. The Percentage Interest of each Unitholder on the Effective Date is set forth on Exhibit A.

"**Permitted Transfer**" has the meaning set forth in Section 10.2.

"**Person**" means an individual or entity.

"**Profits**" and "**Losses**" have the meaning set forth in Exhibit C.

"**Project**" means an indoor firing range and gun club, and related real property and improvements.

"**Project Financing**" means the initial amount borrowed by the Company from the Company's lender, the proceeds of which are to be used to acquire real property on which the Project is to be constructed and to complete the construction of the Project.

"**Purchase Offer**" has the meaning set forth in Section 10.4(a).

"**Purchaser**" has the meaning set forth in Section 10.4(a).

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"**Regulatory Allocations**" has the meaning set forth in Exhibit C.

"**Revenue Procedure**" has the meaning set forth in Section 2.5.

"**Seller**" has the meaning set forth in Section 10.4.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate or otherwise dispose of.

Case 19-80017-CRJ   Doc 9-1   Filed 04/19/19   Entered 04/19/19 16:13:41   Desc
Exhibit A   Page 38 of 47

"**Transferable Interest**" means a Unitholder's right to receive allocations of Profits and Losses, to receive interim, and terminating distributions from the Company, but shall not include any right to participate in the management or affairs of the Company, such as the right to vote on, consent to or otherwise participate in any decision of the Members.

"**Units or Unit**" means an ownership interest in the Company, including any and all benefits to which the holder of such Unit or Units may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement.

"**Unitholder**" means any (i) Member or (ii) other holder of a Transferable Interest that is not a Member that is an owner of one or more Units (or a fraction thereof).

"**Unrecovered Capital Contribution**" with respect to any Common Unitholder, means the sum of all cash paid and all property contributed by such Common Unitholder to the Company with respect to its, his or her Common Units, which sum shall be reduced by distributions made to such Common Unitholder pursuant to Section 4.1(a).

"**Women Unitholders**" has the meaning set forth in Section 1.4. "**Woman Unitholder**" shall have its correlative meaning.

"**WOSB**" has the meaning set forth in Section 1.4.

"**WOSB Term**" has the meaning set forth in Section 1.4.

Case 19-80017-CRJ    Doc 9-1    Filed 04/19/19    Entered 04/19/19 16:13:41    Desc
Exhibit A    Page 39 of 47

## EXHIBIT C

### Capital Accounts and Tax Allocations

**I.    Allocation Definitions.** Capitalized terms and phrases used in this Exhibit C have the following meanings:

"**Adjusted Capital Account Deficit**" means, with respect to any Unitholder, the deficit balance, if any, in such Unitholder's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)     credit to such Capital Account any amounts which such Unitholder is deemed to be obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences in Regulations sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)    debit to such Capital Account the items described in Regulations sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Company Minimum Gain**" has the meaning as the term "partnership minimum gain" set forth in Regulations section 1.704-2(b)(2) and 1.704-2(d).

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Management Committee.

"**Gross Asset Value**" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     the initial Gross Asset Value of any asset contributed by a Unitholder to the Company shall be the gross fair market value (taking Code section 7701(g) into account) of such asset on the date of contribution, as determined by the Management Committee provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to Section 2.1 shall be as set forth in Exhibit A;

Case 19-80017-CRJ   Doc 9-1   Filed 04/19/19   Entered 04/19/19 16:13:41   Desc
Exhibit A    Page 40 of 47

(ii)     the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values as determined by the Management Committee as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Unitholder in exchange for more than a de minimis Capital Contribution or in exchange for the performance of services to or for the benefit of the Company; (B) the distribution by the Company to a Unitholder of more than a de minimis amount of Company property as consideration for an interest in the Company; and (C) the liquidation of the Company within the meaning of Regulations section 1.704-1(b)(2)(ii)(g), provided that an adjustment described in clauses (A) and (B) of this paragraph shall be made only if the Management Committee reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Unitholders in the Company;

(iii)     the Gross Asset Value of any item of Company assets distributed to any Unitholder shall be adjusted to equal the gross fair market value (taking Code section 7701(g) into account) of such asset on the date of distribution as determined by the Management Committee; and

(iv)     the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code section 734(b) or Code section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

"**Member Nonrecourse Debt**" has the same meaning as the term "partner nonrecourse debt" in Regulations section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" has the same meaning as the term "partner nonrecourse deductions" in Regulations sections 1.704-2(i)(1) and 1.704-2(i)(2).

"**Nonrecourse Deductions**" has the meaning set forth in Regulations section 1.704 2(b)(1).

"**Nonrecourse Liability**" has the meaning set forth in Regulations section 1.704-2(b)(3).

C-2

"**Profits**" and "**Losses**" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for the Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

      (i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition will be added to the taxable income or loss;

      (ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition will be subtracted from the taxable income or loss;

      (iii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to (ii) or (iii) of the definition of Gross Asset Value, the amount of the adjustment will be treated as an item of gain (if the adjustment increases the Gross Asset Value of the Company asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the Company asset) from the disposition of the item and will be taken into account for purposes of computing Profits or Losses;

      (iv)   Gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income purposes will be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

      (v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation for the Fiscal Year, computed in accordance with the definition of Depreciation;

      (vi)   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Section 1.704- 1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Unitholder's interest in the Company, the amount of the adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) from the disposition of a Company asset and will be taken into account for purposes of computing Profits or Losses; and

      (vii)  Notwithstanding any other provisions of this definition, any items that are specially allocated pursuant to Section IV hereof will not be taken into account in computing Profits or Losses. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section IV of this Exhibit C will be determined by applying rules analogous to those set forth in clauses (i) through (vi) above.

C-3

**II.** **Capital Accounts.** The Company shall maintain a separate Capital Account for each Unitholder. Each Unitholder's Capital Account shall be maintained in accordance with the following provisions:

(a)    Credits. To each Unitholder's Capital Account there shall be credited (i) such Unitholder's Capital Contributions, (ii) such Unitholder's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section IV or Section V of this Exhibit C, and (iii) the amount of any Company liabilities assumed by such Unitholder or which are secured by any property distributed to such Unitholder. The principal amount of a promissory note which is not readily tradeable on an established securities market and which is contributed to the Company by the maker of the note (or a Unitholder related to the maker of the note within the meaning of Regulations section 1.704 1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Unitholder until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations section 1.704 1(b)(2)(iv)(d)(2);

(b)    Debits. To each Unitholder's Capital Account there shall be debited (i) the amount of money and the Gross Asset Value of any property distributed to such Unitholder pursuant to any provision of this Agreement, (ii) such Unitholder's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section IV or Section V of this Exhibit C, and (iii) the amount of any liabilities of such Unitholder assumed by the Company or which are secured by any property contributed by such Unitholder to the Company;

(c)    Upon Transfers. In the event Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Units; and

(d)    Liabilities. In determining the amount of any liability for purposes of subparagraph (b) above there shall be taken into account Code section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Management Committee shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including without limitation debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Unitholders) are computed in order to comply with such Regulations, the Management Committee may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Section 11 upon the dissolution of the Company. The Management Committee also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Unitholders and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations section 1.704-1(b).

C-4

**III.** **Profits and Losses.** After giving effect to the special allocations set forth in Sections IV and V of this Exhibit C, Profits and Losses for any Fiscal Year shall be allocated among the Unitholders in a manner that will result in the Capital Account balance for each Unitholder (which balance may be positive or negative), after adjusting the Capital Account for all Capital Contributions and distributions and any special allocations required pursuant to this Agreement for the current and all prior Fiscal Years, being (as nearly as possible) equal to (a) the amount that would be distributed to the Unitholder if the Company were to dissolve, wind up its affairs, and sell all of its assets at their current Gross Asset Value, pay all liabilities of the Company (limited, with respect to any Nonrecourse Liabilities, to the value reflected in the Unitholders' Capital Accounts for the assets securing such Nonrecourse Liabilities), and distribute the proceeds thereof in accordance with Section 4.1 minus (b) the Unitholder's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

**IV.** **Special Allocations.** The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Regulations section 1.704-2(f), notwithstanding any other provision of this Exhibit C, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Unitholder shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Unitholder's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Unitholder pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations sections 1.704-2(f)(6) and 1.704-2(j)(2). This subparagraph (a) is intended to comply with the minimum gain chargeback requirement in Regulations section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Except as otherwise provided in Regulations section 1.704-2(i)(4), notwithstanding any other provision of this Exhibit C, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Unitholder who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such allocation Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Unitholder's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Regulations section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Unitholder pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations sections 1.704-2(i)(4) and 1.704-2(j)(2). This subparagraph (b) is intended to comply with the minimum gain chargeback requirement in Regulations section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event any Unitholder unexpectedly receives any adjustments, allocations, or distributions described in Regulations sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income

C-5

and gain shall be specially allocated to such Unitholder in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Unitholder as quickly as possible, provided that an allocation pursuant to this subparagraph (c) shall be made only if and to the extent that the Unitholder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Exhibit C have been tentatively made as if this subparagraph (c) were not in the Agreement.

(d)     Gross Income Allocation.  In the event any Unitholder has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Unitholder is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Unitholder is deemed obligated to restore pursuant to the penultimate sentences of Regulations sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Unitholder shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this subparagraph (d) shall be made only if and to the extent that such Unitholder would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Exhibit C have been made as if subparagraph (c) above and this subparagraph (d) were not in the Agreement.

(e)     Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Unitholders in proportion to their respective Percentage Interests.

(f)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Unitholder who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations section 1.704-2(i)(1).

(g)     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code section 734(b) or Code section 743(b) is required, pursuant to Regulations section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Unitholder in complete liquidation of such Unitholder's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Unitholders in accordance with their interests in the Company in the event Regulations section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Unitholder to whom such distribution was made in the event Regulations section 1.704-1(b)(2)(iv)(m)(4) applies.

**V.     Curative Allocations.**  The allocations set forth in Sections IV(a) through IV(g) of this Exhibit C (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section V. Therefore, notwithstanding any other provision of this Exhibit C (other than the Regulatory Allocations), the Management Committee shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Unitholder's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Unitholder would have had if the

C-6

Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections II, III, and IV of this Exhibit C.

VI.     **Other Allocation Rules**.

(a)     Profits, Losses, and any other items of income, gain, loss, or deduction will be allocated to the Unitholders pursuant to this Exhibit C as of the last day of each taxable year; provided, that Profits, Losses, and such other items will also be allocated at such times as the Gross Asset Values of any Company assets are adjusted pursuant to clause (ii) of the definition of "Gross Asset Value."

(b)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any other items will be determined on a daily, monthly, or other basis, as determined by the Management Committee using any permissible method under Code Section 706 and the Regulations thereunder.

(c)     The Unitholders are aware of the income tax consequences of the allocations made pursuant to the provisions of this Exhibit C and hereby agree to be bound by the provisions of this Exhibit C in reporting their shares of Company income and loss for income tax purposes.

(d)     Solely for purposes of determining a Unitholder's proportionate share of the "excess nonrecourse liabilities" of the Company relating to Company assets within the meaning of Regulations Section 1.752-3(a)(3), the Unitholders' interests in Company profits will be equal to their Percentage Interests.

VII.     **Tax Allocations: Code Section 704(c).**   In accordance with Code section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Unitholders so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) of the definition of Gross Asset Value). In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Management Committee in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section VII are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Unitholder's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

# **EXHIBIT D**

## **Officers**

<u>Name</u>                                   Office

Melanie H. Murray

President - The President shall be the chief executive officer of the Company. She shall have general supervisory powers over all other Officers, employees, and agents of the Company for the proper performance of their duties and shall otherwise have the general powers and duties of supervision and management usually vested in the chief executive officer of a company, subject to the general direction of the Management Committee. The President may sign, execute and deliver in the name of the Company, powers of attorney, contracts, bonds and other obligations of the Company and shall perform such other duties as may be prescribed from time-to-time by the Management Committee.

William Roberts

Vice President of Operations – The Vice President of Operations shall have such powers and duties as usually appertain to his office and whatever other powers and duties are prescribed by this Agreement or by the Management Committee. The Vice President of Operations shall be the second highest executive officer of the Company and shall report to the President of the Company. The Vice President of Operations shall have such responsibilities for the management of the business of the Corporation as may be assigned to him by the President or the Management Committee.